## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MABLENE JONES,                        )
                                      )
        Plaintiff,                )
                                      )
vs.                                   )      Case No. 13-cv-414-GKF-TLW
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security, )
                                      )
        Defendant.                )

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Jeffrey O. Smith seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and

laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 53-year old female, applied for applied for Title II and Title XVI benefits on May 20, 2010, alleging a disability onset date of March 7, 2008. (R.148-49, 150-53). According to the ALJ's decision, plaintiff also applied for Title II widow's benefits, but that application is not in the administrative record. (R. 21). She later amended her disability onset date to January 7, 2009 (R. 53). Plaintiff claimed that she was unable to work due to hypertension/high blood pressure, GERD, stress, and depression. (R. 172). By the time of the ALJ hearing, plaintiff also alleged that she was unable to work due to degenerative joint disease in her knees. (R. 44-77).

Plaintiff's claim for benefits was denied initially on August 2, 2010, and on reconsideration on December 14, 2010. (R.78-98). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on December 5, 2011. (R.44-77). The ALJ issued a decision on January 25, 2012, denying benefits and finding plaintiff not disabled because she was able to perform other work. (R. 18-37). The Appeals Council denied review, and plaintiff appealed. (R. 1-5).

### The ALJ's Decision

The ALJ found that plaintiff was insured under Title II through August 31, 2011 for her widow's benefits and December 31, 2013 for her personal benefits. (R. 23-24). Plaintiff had not engaged in any substantial gainful activity since January 7, 2009, her amended alleged onset date. (R. 24). Plaintiff had severe impairments of "degenerative joint disease of the knees and depression." Id. Plaintiff's impairments of hypertension (sometimes not well controlled), GERD, and irritable bowel syndrome were not severe impairments. (R. 24). These impairments included symptoms of heartburn, nausea, and vertigo. Id. Plaintiff's impairments did not meet or medically equal a listing. (R. 24-25). The ALJ considered musculoskeletal impairments (Listing

1.00) and analyzed plaintiff's depression using the "paragraph B" criteria. Id. The ALJ found that plaintiff had mild limitations in the area of activities of daily living and moderate limitations in social functioning and in concentration, persistence, and pace. (R. 25).

The ALJ then reviewed plaintiff's testimony and the medical evidence to establish her residual functional capacity. (R. 36-39). Plaintiff testified that she had pain and swelling in both knees on a daily basis. (R. 26-27). Her pain increased with sitting and standing, and she stated that her doctor told her "to get off her feet." (R. 27). Plaintiff's doctor had recently mentioned the possibility of physical therapy and surgery, but, to date, she had only been given medication. Id. Plaintiff stated that her doctor had recommended she use a cane, but plaintiff refused to do so. Id. Lifting and carrying more than ten pounds caused pain in her knees. Id. Plaintiff's irritable bowel syndrome caused her to lose control of her bodily functions approximately once a month. Id. Plaintiff also testified that her depression medication increased her depressive symptoms, but no doctor had ever referred her for counseling or therapy, although her doctor had recommended it. Id. Despite her impairments, plaintiff was able to drive and shop. Id. Her niece helped her remember to take her medication. Id.

Plaintiff's medical records showed treatment from primary care physicians at Tulsa Dream Center Health Services. Id. In June 2007, plaintiff was given a "probable" diagnosis of degenerative joint disease of the right knee after a physical examination showed plaintiff had full range of motion with joint line tenderness. Id. In January 2009, an x-ray showed "a moderate amount of narrowing about the medial sides of both knee joints as well as some narrowing about the patellofemoral spaces bilaterally. There were some bony deformity and bony irregularity involving the posterior aspects of both patellas. There were small bony spurs involving both knee regions, and bony demineralization of all bony structures." (R. 27). Plaintiff again complained of knee pain in March 2011 and reported that the arthritis medication was not working. Id. Her

physician again noted a diagnosis of degenerative joint disease. Id. In June 2011, plaintiff complained that her right knee was locking up, but her physical examination revealed "no effusion of the knees." Id. Plaintiff complained of right knee pain and weakness again in October 2011, but she had never fallen, and she had a normal range of motion. Id.

The ALJ concluded that plaintiff's degenerative joint disease was moderate, limiting her to light work and excluding the use of foot controls. Id. The ALJ also noted that the objective medical evidence supported those limitations but nothing more restrictive. Id. The ALJ also declined to grant plaintiff's request for a physical consultative examination, finding that the medical records were sufficient to render a decision. (R. 27-28).

Plaintiff did undergo a mental consultative examination in July 2010, based on her complaints of depression. (R. 28). The consultative examining psychologist diagnosed plaintiff with major depressive disorder, moderate, stemming from "a longstanding grief reaction that had not been treated." Id. The psychologist noted that plaintiff had some difficulty with recalling words, but her other test results were normal. Id. Plaintiff's GAF score of 55 also reflected moderate symptoms. Id. The psychologist recommended treatment, noting that plaintiff would likely improve with help. Id.

Based on this medical evidence, the ALJ found that plaintiff's complaints were not entirely credible. (R. 28-29). The ALJ found that plaintiff's testimony about her limited activities of daily living "cannot be objectively verified" and were not supported by "the relatively weak medical evidence." (R. 28). Additionally, the ALJ relied on the limited treatment plaintiff had received, noting that plaintiff took only medication for her degenerative joint disease. Id. The ALJ rejected plaintiff's claims that her depression medication made her more depressed. Id. She also noted that no objective medical evidence supported plaintiff's claims of disabling pain. (R. 28-29).

Finally, the ALJ addressed the medical opinions, including four opinions from Dr. Dennis Koldkolo and one "return to work slip" from Dr. John Hudson. (R. 29-30). All four of Dr. Koldkolo's opinions were dated November 9, 2011, and each addressed a different aspect of plaintiff's ability to perform basic work activities – plaintiff's pain level, plaintiff's ability to perform sedentary work, plaintiff's ability to perform unskilled work, and plaintiff's ability to work consistently in a normal work week. (R. 29). In each of these opinions, Dr. Koldkolo opined that plaintiff could not work, due in varying degrees to her degenerative joint disease, depression (which impacted her ability to concentrate), pain, and hypertension. Id.

The ALJ cited the treating physician rule set forth in the regulations and accompanying agency rulings. (R. 28-29). The ALJ presumed that Dr. Koldkolo was plaintiff's treating physician. (R. 29). The ALJ noted that she could not evaluate Dr. Koldkolo's expertise or the length of his relationship with plaintiff based on the record. Id. The ALJ did find that Dr. Koldkolo's limitations were not consistent with plaintiff's treatment notes. Id. Specifically, the ALJ cited objective medical evidence that showed "no effusion and normal range of motion of the knee" and x-rays that indicated the existence of degenerative joint disease but were not consistent with the level of pain cited in the opinions. Id. With respect to Dr. Koldkolo's comments on plaintiff's issues with concentration and work stress, the ALJ concluded that "simple, routine, repetitive tasks" would accommodate plaintiff's limitations. (R. 29). For these reasons, the ALJ rejected Dr. Koldkolo's opinions by giving them "little weight." Id.

The ALJ also rejected Dr. Hudson's opinion. On April 1, 2009, Dr. Hudson opined that plaintiff should not return to work due to "stress-related anxiety and depression." (R. 30). The ALJ found that this opinion constituted an opinion on an issue reserved to the Commissioner; therefore, that opinion could not be given controlling weight or special significance. Id. The ALJ considered the opinion and found that it was not supported by the record evidence because "Dr.

Hudson submitted no objective findings in support of his statement, and the record does not show significant treatment for stress-related anxiety that would result in an inability to work." Id.

The ALJ gave some weight to the opinion of the consultative examining psychologist, Dr. Maribeth Spanier, who found that plaintiff's "attention and concentration are variable and limited," thereby affecting her "intellectual abilities." Id. The ALJ concluded that Dr. Spanier's opinion was based on her examination of plaintiff and was consistent with a limitation to simple, repetitive, routine tasks. Id. The ALJ gave great weight, however, to the opinions of the agency psychologists with respect to plaintiff's mental limitations. (R. 31). The agency psychologists determined that plaintiff could perform simple, routine tasks. Id.

Based on this evidence, the ALJ determined that plaintiff retained the residual functional capacity to perform light work with the following limitations: no foot controls; simple, routine, repetitive tasks; superficial interaction with co-workers and supervisors; and no significant interaction with the public.[1] (R. 26). Plaintiff could not perform her past relevant work, but she could perform other work. (R. 31-32). Accordingly, the ALJ found plaintiff not disabled. (R. 33).

**The ALJ Hearing**

The ALJ held a hearing on December 5, 2011. (R. 46-77). Plaintiff was represented by a non-attorney representative at the hearing. (R. 46). Plaintiff alleged a disability onset date of March 2008, but she stopped working in September 2008. (R. 53). She then moved to amend her onset date to January 7, 2009, the date of the x-ray confirming degenerative joint disease in her knees. Id.

---

[1] During the hearing, the ALJ posed a hypothetical to the vocational expert that limited plaintiff to no public contact, rather than no significant contact. (R. 71-72). Neither party addresses this discrepancy in the briefing. Importantly, the ALJ relied on the vocational expert's list of other work based on the hypothetical given at the hearing, so at most, the discrepancy should qualify as a scrivener's error.

Plaintiff testified that she has pain and swelling in both knees, although her right knee is worse than her left. (R. 54). Standing and sitting increase her pain. (R. 55). Plaintiff's doctors have treated her knee pain with medication, although she testified that her doctors had recently mentioned the possibility of physical therapy and/or surgery. (R. 56). Plaintiff testified that she had to sit or lie down to relieve the pain because walking did not help diminish her symptoms. (R. 57). Plaintiff's physician had asked her to use a cane, but plaintiff said she was "not ready for one." (R. 62).

Plaintiff complained that she suffered from IBS and had accidents about once a month. (R. 58).

Plaintiff also testified that her depression medication did not control some of her symptoms and, she believed, made those symptoms worse. (R. 58, 62). Plaintiff complained that her mind was "always going. Always running" and would wander so that she could not function. (R. 58). Plaintiff also complained that she cried often and suffered insomnia two times per week and that her physician had recently told her she needed counseling but had not made a referral. (R. 59-60). Plaintiff also stated that she would hit herself in the face or arm when she was upset about not being able to do the things she wanted to do. (R. 61-62). She also felt dizzy and nauseated and had to lie down to relieve her symptoms. (R. 62).

Plaintiff's niece helps clean the house and remind plaintiff to take her medication. Plaintiff can make simple meals, such as sandwiches, but she does not cook. (R. 64). Plaintiff leaves the house twice a week to go to the store and to doctor's appointments. (R. 64-65). She can drive, but her niece often drives for her. (R. 65).

Plaintiff testified that she would not work well with supervisors in a work setting because she could not handle criticism or instruction. (R. 67). Plaintiff also believes she would not be able to complete tasks because of her issues with concentration and attention. (R. 67-68).

The vocational expert testified. He reviewed plaintiff's past relevant work, which ranged from sedentary to medium with SVP of 3-4. (R. 70-71). In response to the ALJ's hypothetical regarding light work with additional limitations, the vocational expert stated that plaintiff could perform other work as a sorter, hand packer, and office helper. (R. 72). The ALJ also posed a hypothetical involving sedentary work, and the vocational expert gave examples of other work plaintiff could perform. (R. 72-74). Plaintiff's representative also posed a hypothetical, setting forth a number of circumstances that would prevent plaintiff from performing any competitive work. (R. 74-75).

**Plaintiff's Medical Records**

With the exception of two unrelated emergency room reports from 2006 and 2008, plaintiff's sole source of treatment was Tulsa Dream Center. Plaintiff saw a number of physicians there between February 2007 and November 2011. (R. 309-32, 362-78).

Plaintiff complained of UTIs in February 2007, November 2007, September-October 2010, and February 2011. (R. 318, 321, 363-65, 378). Each time, plaintiff was treated conservatively with antibiotics or recommendations to drink more water and cranberry juice. Id.

Plaintiff began complaining of knee pain in June 2007. (R. 320). Physical examination showed full range of motion but joint line tenderness. Id. Dr. Hudson diagnosed probable degenerative joint disease of the right knee and recommended that plaintiff take naproxen as needed. Id. Plaintiff did not complain of knee pain again until January 2009. (R. 313). At that time, plaintiff had tenderness in both knee joints, so the examining physician ordered x-rays, taken that same day. Id. The x-rays revealed

> a moderate amount of narrowing about the medial sides of both knee joints as well as some narrowing about the patellofemoral spaces bilaterally. There is noted to be some bony deformity and bony irregularity involving the posterior aspects of both patellas. Small bony spurs are noted involving both knee regions. There is

noted to be some bony demineralization involving all of the visualized bony structures on these films.

(R. 327). The radiologist did not offer any diagnoses or give any opinion regarding limitations.

After receiving the x-rays in January 2009, plaintiff did not return to the clinic until April 2009. (R. 312). At that time, she did not complain of knee pain, but she did ask for a written statement that she needed to stop working due to stress. Id. Dr. Hudson completed a form that day, stating without explanation that plaintiff could/should not return to work due to "stress related anxiety/depression." (R. 307).

Plaintiff continued to seek treatment at Tulsa Dream Center every few months for hypertension, ringing in her ears, gastrointestinal discomfort, ear infections, and UTIs. She did not complain of knee pain again until February 2011. (R. 378). At that time, plaintiff complained of left knee pain and numbness in her right foot. Id. The examining physician conducted a physical examination, which revealed tenderness in the left knee. Id. The doctor prescribed 800mg of ibuprofen. Id. Plaintiff complained of knee pain the following month and in June 2011. (R. 375, 377). In June 2011, plaintiff stated that she had knots and pain in her right knee and that her knee locked at times. (R. 375). Dr. Koldkolo performed a physical examination and found no effusive range of motion in plaintiff's knee. Id. He increased one of plaintiff's medications. Id. In October 2011, plaintiff's last appointment prior to the ALJ hearing, plaintiff stated that she felt her right knee would give out, but she had not fallen. (R. 370). Physical examination showed decreased range of motion. Id. The following month, Dr. Koldkolo, who had examined plaintiff three times, completed the four medical opinions. (R. 379-82).

With respect to plaintiff's depression/anxiety, the first mention of any issue is April 2009, when plaintiff asked for a written statement that she could not work due to stress and anxiety. (R. 312). Plaintiff next complained of depression in September 2010. (R. 365). Dr. Hudson

prescribed citalopram (Prozac). (R. 365). The record also indicates that plaintiff was already on a depression medication, but she could not remember what she was taking.[2] Id. Plaintiff did not list an antidepressant in her disability report. (R. 174). In June 2010, she reported no mental health medications. (R. 179, 195). Additionally, in July 2010, plaintiff did not list an antidepressant in her list of medications when she attended the consultative psychological examination. (R. 333-40). In the final list of medications, undated but completed after October 2011, plaintiff stated that she was taking Tramadol for depression and had been doing so since 2010.[3] (R. 241). Plaintiff did complain in March 2011 that she did not believe the citalopram was working, even though she had been taking it since October 2010. (R. 377). Thereafter, her medical records do not indicate that she was taking an antidepressant. (R. 370-76).

The consultative examining psychologist diagnosed plaintiff with moderate depressive disorder in July 2010, a condition stemming from "a longstanding grief reaction that has not been treated." (R. 339). Plaintiff complained that she was sad and depressed, with symptoms of "psychomotor agitation, poor sleep, poor motivation, low energy, social isolation, poor frustration tolerance, irritability, and poor concentration." (R. 335). Plaintiff's problems began after she lost her husband in 2004, although she continued working until 2008. Id. The psychologist found plaintiff "slightly distracted and detached through the interview," although her thoughts were logical and organized. (R. 338). After a mental status examination, the psychologist concluded that plaintiff's "attention and concentration are considered variable and limited." Id. Plaintiff's lack of concentration and attention also affected her ability to perform

---

[2] Despite the treatment note, in which plaintiff reported taking antidepressants, the record does not indicate that plaintiff had been prescribed citalopram or any similar medication before September 2010.

[3] The undersigned's review of the record does not contain any prescriptions for Tramadol, either for pain or for depression.

higher on an IQ test. (R. 338). Plaintiff had adequate judgment and could manage her own funds. (R. 339-40). Based on this examination, agency psychologists completed a mental residual functional capacity form, which the ALJ later adopted. (R. 341-43).

**ANALYSIS**

Plaintiff raises three arguments on appeal. First, plaintiff argues that the ALJ failed to include all of plaintiff's limitations in the residual functional capacity findings. (Dkt. 17). Second, plaintiff argues that the ALJ failed to properly consider the medical opinions of plaintiff's treating physician, Dr. Koldkolo, and the consultative examining psychologist. Id. Finally, plaintiff argues that the ALJ failed to conduct a proper credibility analysis. Id.

<u>**Residual Functional Capacity Analysis**</u>

Plaintiff contends that the ALJ made two errors in analyzing plaintiff's residual functional capacity. First, plaintiff argues that the ALJ failed to incorporate all of the step two findings regarding plaintiff's mental limitations into the residual functional capacity findings at step four. Id. Second, plaintiff argues that the ALJ failed to consider plaintiff's anxiety and UTIs at either step two or step four. Id.

**Step Two/Step Four**

The ALJ found that plaintiff had moderate limitations in concentration, persistence, and pace at step two, based on plaintiff's testimony, function reports, and Dr. Spanier's findings. (R. 25). Based on the same evidence, the ALJ also found that plaintiff had moderate limitations in social functioning. Id. Plaintiff argues that the ALJ did not address these limitations at step four and did not include them in the hypothetical for the vocational expert. (Dkt. 17). Plaintiff claims that "nothing even resembling a limitation on concentration, persistence, or pace was presented to the [vocational expert]." Id. The Commissioner argues that plaintiff confuses step two findings with step four findings and misconstrues the applicable case law. (Dkt. 18). The Commissioner

points out that the ALJ limited plaintiff to simple, repetitive, routine tasks and limited her contact with the public, limitations that would accommodate the step two findings. (Dkt. 18).

Plaintiff does not appear to argue that the ALJ should have imposed further restrictions on the nature of the work she can perform. (Dkt. 17). Even if plaintiff is making such an argument, she fails to identify what those additional restrictions should be. Rather, plaintiff argues that failing to include "moderate limits in concentration, persistence, and pace" and "moderate limits in social functioning" in the residual functional capacity findings and the hypothetical presented to the vocational expert constitutes reversible error. Id.

The ALJ is not required to include the broad categorizations of the paragraph b limitations in the hypothetical to the vocational expert. See Jimison ex rel. Sims v. Colvin, 513 Fed.Appx. 789, 793 (10th Cir. 2013) (unpublished). Instead, the ALJ is required to assess the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p. See also Jimison, 513 Fed.Appx. at 793. As the regulations provide,

> [t]he adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings . . . .

SSR 96-8p. See also Chrisman v. Colvin, 531 Fed.Appx. 893, 897-98 (10th Cir. 2013) (unpublished) (explaining the difference between the analysis of mental impairments at steps two and four and holding that the broad limitations found at step two should not be included in the residual functional capacity findings and hypothetical given to the vocational expert).

In this case, the ALJ found that plaintiff only retained the residual functional capacity to perform simple, repetitive, routine tasks. These limitations demonstrate that the ALJ

incorporated plaintiff's limitations regarding concentration, persistence, and pace into her residual functional capacity findings and the hypothetical to the vocational expert. See Nixon v. Barnhart, 49 Fed.Appx. 254, 256 (10th Cir. 2002) (unpublished) (holding that a limitation to simple instructions accommodated deficiencies in concentration, persistence, and pace that resulted in a failure by plaintiff to complete tasks in a timely manner). The Tenth Circuit, in Nixon, cited to the Eighth Circuit's published decision in Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001), in which the Eighth Circuit held "that [a] description of claimant as capable of doing simple, repetitive jobs adequately accounted for deficiencies of concentration, persistence, or pace." Id. Similarly, the ALJ's residual functional capacity findings limiting plaintiff's contact with the public are consistent with her step two findings that plaintiff had moderate limitations in social functioning. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00C.2 (defining "social functioning" to include a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. . . Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.").

The ALJ is required to take into account all of plaintiff's functional limitations, not repeat verbatim the exact words used at Step Two. The ALJ did so here. Thus, the undersigned recommends that the District Court reject this argument.

**Failure to Consider All Impairments**

Plaintiff also argues that the ALJ erred at step two/step four by failing to consider plaintiff's impairments of anxiety and UTIs. (Dkt. 17). The Commissioner contends that plaintiff's argument is "conclusory, unsupported, and undeveloped" because plaintiff has not

established that these impairments caused any limitation or impacted the ALJ's decision. (Dkt. 18).

The ALJ does not mention either anxiety or UTIs in her decision. However, plaintiff never raised either diagnosis as an impairment that limits her ability to work. (R. 172). As to plaintiff's anxiety, the only mention of it in the record is Dr. Hudson's April 1, 2009, opinion that plaintiff should not return to work because of "stress-related anxiety and depression." (R. 307). However, plaintiff was never diagnosed with "anxiety." Rather, she was diagnosed with and treated for depression. The record clearly indicates that the "anxiety" diagnosis was not a proper or official diagnosis and that the ALJ's analysis of plaintiff's depression addresses all of her mental impairments.[4] (R. 24-26, 28-30). Moreover, plaintiff has not objected to the ALJ's treatment of her depression.

With respect to the UTIs, plaintiff contracted a UTI on four separate occasions in a four-year period. (R. 318, 321, 363-65, 378). Each time, plaintiff was treated for the symptoms. At no point did plaintiff argue, nor do her medical records indicate, that UTIs were an ongoing problem that limited her ability to work or signaled a symptom of a larger medical issue. The only evidence that would have placed the ALJ on notice of such an issue was plaintiff's testimony that she sometimes urinated on herself; however, plaintiff indicated that this limitation was due to her mobility issues stemming from knee pain, not a UTI issue. (R. 57-58). Accordingly, nothing in the record suggests that the UTIs are anything more than medically nondeterminable impairments. For this reason, plaintiff did not meet her burden of establishing UTIs as a severe

---

[4] As noted in the discussion of the ALJ's decision, the ALJ made findings regarding plaintiff's mental impairments at step two. (R. 24-26). At step four, the ALJ incorporated those findings into the residual functional capacity findings as functional limitations, including the limitation to simple, repetitive, routine tasks. (R. 28-30). In reaching those conclusions, the ALJ discussed plaintiff's testimony regarding her depression, the medical records outlining plaintiff's limited treatment, Dr. Hudson's return to work slip, and Dr. Spanier's findings. Id.

impairment. See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988) (holding that a finding that a severe impairment exists at step two requires plaintiff to make a "threshold" or "*de minimis*" showing that the impairment "significantly limits his ability to do basic work activities").

## Medical Opinions

Plaintiff alleges two basic errors regarding the ALJ's consideration of the medical opinions. First, plaintiff contends that the ALJ failed to give legitimate reasons for assigning little weight to the opinions of Dr. Koldkolo and Dr. Hudson, plaintiff's treating physicians. Plaintiff specifically cites to the ALJ's failure to mention the x-rays of plaintiff's knees. (Dkt. 17). Second, plaintiff contends that the ALJ erred in giving some weight to the opinions of the consultative examining psychologist and the agency physicians who opined on plaintiff's mental impairments. Plaintiff claims that this error arises out of the ALJ's decision to ignore plaintiff's limitations on concentration, persistence, and pace. Id.

### Treating Physician's Opinions

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

The analysis of a treating physician's opinion is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. §§ 404.1527 and 416.927. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. See Anderson v. Astrue, 319 Fed. Appx. 712, 717 (10th Cir. 2009) (unpublished).

Finally, in reviewing medical opinions, if the medical opinion contains conclusions regarding issues reserved to the Commissioner, the ALJ cannot give that opinion controlling or significant weight, although the ALJ still must evaluate the opinion. <u>See</u> 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p.

Here, the ALJ conducted a proper analysis of Dr. Koldkolo's opinions. First, the ALJ gave plaintiff the benefit of the doubt regarding Dr. Koldkolo's status as a treating physician. (R. 30). The ALJ noted that the record did not establish Dr. Koldkolo's specialty or any details regarding his treating relationship with plaintiff. <u>Id.</u> From there, the ALJ made specific findings about whether the record supported his limitations. <u>Id.</u> The ALJ found that Dr. Koldkolo's limitation on plaintiff's use of her neck and hands was not supported by any medical evidence. <u>Id.</u> The ALJ found discrepancies between plaintiff's complaints of pain and the objective medical findings – namely, the x-rays and the physical examination findings. <u>Id.</u> The ALJ also considered Dr. Koldkolo's opinions regarding plaintiff's attention and concentration, but the ALJ rejected them because "[t]here is an absence of mental health treatment in the record" and because plaintiff's issues could be accommodated with a limitation to simple, repetitive, routine tasks. <u>Id.</u>

Accordingly, the ALJ gave multiple reasons for rejecting Dr. Koldkolo's opinion. All of them are supported by the record.

The ALJ also rejected Dr. Hudson's opinion because it opined on plaintiff's residual functional capacity, an issue reserved to the Commissioner. <u>Id.</u> Notwithstanding that finding, the ALJ gave two specific reasons for rejecting Dr. Hudson's opinion that plaintiff's "stress-related anxiety and depression" prevented her from returning to work. <u>Id.</u> First, Dr. Hudson cited no objective evidence to support his opinion. <u>Id.</u> Second, the medical records contained no evidence

of "significant treatment for stress-related anxiety that would result in an inability to work." (R. 30). There is substantial evidence in the record to support the ALJ's reasoning.

**Consultative Examining Physicians and Agency Physicians**

With respect to Dr. Spanier's opinion, plaintiff argues that the ALJ failed to consider Dr. Spanier's findings with respect to plaintiff's limitations in the areas of attention and concentration. (Dkt. 17). As discussed *supra*, the ALJ's finding that plaintiff could perform only simple, repetitive, routine tasks is a proper accommodation for plaintiff's difficulties with attention and concentration. Accordingly the ALJ did consider Dr. Spanier's opinion, gave it "some weight," and incorporated Dr. Spanier's findings into the residual functional capacity analysis.

Plaintiff also argues that the ALJ erred in giving great weight to the agency psychologist's opinions regarding plaintiff's mental impairments. Plaintiff contends that the agency psychologist found no limits in concentration, persistence, and pace; therefore, the ALJ erred in relying on those findings. Id. However, the mental residual functional capacity form indicates that the agency psychologist found plaintiff had marked limitations in her ability to understand, remember, and carry out detailed instructions, but no significant limitations in any other area of concentration and persistence. (R. 341-44). In addition, the agency form was completed after the consultative examining psychologist, Dr. Spanier, released her report. Although the MRFC form does not reference that opinion, the PRT form, completed at the same time, does discuss its findings in detail. (R. 341-44, 345-58). Accordingly, the agency psychologist had the information necessary to properly review plaintiff's mental residual functional capacity.

Finally, the ALJ's findings that plaintiff could perform simple, repetitive, routine tasks do not appear to be inconsistent with either Dr. Spanier's findings or the agency psychologist's

findings. The Tenth Circuit finds no error when the residual functional capacity finding is "generally consistent" with the findings in a medical opinion or when the residual functional capacity finding is "more favorable" to the claimant than the medical source's findings. See Keyes-Zachary v. Astrue, 695 F.3d 1156, 1162-63 (10th Cir. 2012). The Tenth Circuit finds no reversible error in that circumstance for "common sense" reasons. Id. at 1166. Essentially, "[t]here is no reason to believe that a further analysis or weighing of [the] opinion could advance [the claimant's] claim of disability." Id. at 1162-63.

Here, plaintiff argues that the ALJ gave great weight to a medical opinion that made no accommodation for plaintiff's concentration issues; however, the ALJ's decision does make such an accommodation and is, therefore, more favorable to plaintiff than the medical source's finding. Specifically, the ALJ limited plaintiff to simple, repetitive, routine tasks to accommodate her limited ability to concentrate. Thus, the ALJ did not commit reversible error in weighing the medical opinions.

**Credibility**

Plaintiff argues that the ALJ's credibility findings are conflicting and hard to follow because the ALJ made an overall finding that plaintiff was partially credible but then found plaintiff not credible with respect to certain aspects of her testimony. (Dkt. 17). The Commissioner argues that the ALJ clearly indicated where she found plaintiff credible and gave good reasons for finding plaintiff not entirely credible. (Dkt. 18).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ made credibility findings throughout her decision. Many of the credibility findings rely on boilerplate language – for example, finding plaintiff "not entirely credible in light of discrepancies between the claimant's alleged symptoms, and objective documentation in the file." (R. 28). However, the ALJ made specific findings to support her conclusions. The ALJ found that the medical evidence was "relatively weak," as evidenced by the conservative treatment (medication) used to treat plaintiff's degenerative joint disease and depression. Id. The ALJ discussed the x-rays and physical examination findings in great detail, and she concluded that the evidence did not support plaintiff's claims of disabling pain. (R. 28-29). The ALJ also considered plaintiff's testimony regarding her activities of daily living and discounted them in light of the objective medical evidence. (R. 28). The ALJ did specifically credit plaintiff's testimony about her "difficulty with emotions, and the allegations of difficulty with supervisors" and concluded that plaintiff should be limited to superficial contact with supervisors. Id.

These findings are sufficiently specific to support the ALJ's finding that plaintiff was only partially credible. Additionally, the ALJ's findings are clear enough to allow the Court to determine those areas in which the ALJ found plaintiff credible and those areas where she did not.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED**.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by June 23, 2014.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 9th day of June, 2014.

_____
T. Lane Wilson
United States Magistrate Judge