# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MABLENE JONES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-CV-414-GKF-TLW |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Before the court are the Report and Recommendation of United States Magistrate Judge T. Lane Wilson on judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits [Dkt. #20] and the Objections thereto filed by plaintiff, Mablene Jones ("Jones"). [Dkt. #21]. The Magistrate Judge concluded the decision of the Administrative Law Judge ("ALJ") was supported by substantial evidence and complied with legal requirements, and recommended the Commissioner's decision be affirmed. [Dkt. #20 at 1, 22].

## I. Procedural History

Jones filed an application for Title II benefits on May 20, 2010 and Title XVI benefits on May 26, 2010, alleging a disability onset date of March 7, 2008. [R. 148-149, 150-153]. She later amended her disability onset date to January 7, 2009. [R. 53]. The claim was denied initially and on reconsideration. [*Id.*]. An administrative hearing was held before ALJ Deborah L. Rose on December 5, 2011. [R. 44-77]. By decision dated January 25, 2012, the ALJ found that Jones was not disabled. [R. 21-37]. The Appeals Council denied review. [R. 1-5]. As a

result, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## II. Standard of Review

Pursuant to Fed. R. Civ. P. 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." However, even under a de novo review of such portions of the Report and Recommendation, this court's review of the Commissioner's decision is limited to a determination of "whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* It is more than a scintilla, but less than a preponderance. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). Disability is defined under the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of her alleged disability. 20 C.F.R. §§ 404.1512(c), 416.912(c). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. A plaintiff is

disabled under the Act only if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (setting forth the five steps in detail). The claimant bears the burden of proof at steps one through four. *Williams*, 844 F.2d at 751 n.2. At step one, a determination is made as to whether the claimant is presently engaged in substantial gainful activity. *Id.* at 750. At step two, a determination is made whether the claimant has a medically determinable severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *Id.* at 750-51. At step three a determination is made whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. *Id.* at 751. If it is, the claimant is entitled to benefits. *Id.* If it is not, the evaluation proceeds to the fourth step, where the claimant must show that the impairment prevents her from performing work she has performed in the past. *Id.* If the claimant is able to perform her previous work, she is not disabled. *Id.* If she is not able to perform her previous work, then the claimant has met her burden of proof, establishing a prima facie case of disability. The evaluation process then proceeds to the fifth and final step: determining whether the claimant has the residual functional capacity ("RFC")[1] to perform other work in the national economy in view of her age, education and work experience. *Id.* The Commissioner bears the burden at step five, and the claimant is entitled to benefits if the

---

[1] A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. *Williams,* 844 F.2d at 751.

3

Commissioner cannot establish that the claimant retains the capacity "to perform an alternative work activity and that this specific type of job exists in the national economy." *Id.*

### III. Claimant's Background

Jones was born November 30, 1957. [R. 148]. Her husband, Michael Jones, died August 7, 2004. [R. 149]. She previously worked as an encoder, courier, data entry worker, sorting operator, van driver and laundry worker. [R. 31]. She has not engaged in substantial gainful activity since January 7, 2009, the amended alleged onset date. [R. 24].

### IV. Administrative Hearing

Jones has a twelfth grade education. [R. 54]. During high school, she took VoTech classes on being a cashier. [*Id.*]. She is able to read, write and do basic math. [*Id.*].

Jones testified she has swelling and pain in both knees every day; her right knee is worse than her left. [R. 54-55]. Besides medication, doctors have recommended surgery and/or physical therapy. [R. 56]. At her doctor's recommendation, she will relax, sit and lie down to relieve the pain and swelling. [*Id.*]. She gets up only to make something to eat or go to the bathroom. [R. 57]. Sometimes she has accidents and urinates on herself. [R. 58]. She has bowel movement accidents about once a month. [*Id.*]. Her doctor has suggested she use a cane, but she testified, "I am not ready for one." [R. 62].

Jones suffers from depression. [*Id.*]. She testified her mind is "always going. . . . [a]lways running." [*Id.*]. Her mind wanders, sometimes she "can't function," and she cries a lot. [R. 58-59]. She has these symptoms "every day and night," and sometimes—about two days a week—she can't go to sleep. [*Id.*]. Her doctors at Tulsa Dream Center Health Services ("Dream Center") tell her to relax. [*Id.*]. The doctors say she needs counseling or therapy but she has not been sent to anyone yet. [R. 59-61]. Sometimes she hits herself in the arm or face because she

gets upset that she can't do things she wants to, like cleaning up and cooking, when she wants to. [R. 61-62]. The medication prescribed for her depression makes her feel dizzy, nauseated and more depressed. [R. 62].

Jones testified she does not sleep at night because her mind is "always running." [R. 63]. She might sleep more in the daytime than at night, staying up to 4:00 in the morning, sleeping until 2:00 in the afternoon, sleeping again from 6:00 to 8:00 in the evening, and then staying up the rest of the night. [*Id.*]. She fixes herself sandwiches but doesn't "really cook." [R. 64]. Her niece reminds her to take her medicine and cleans house for her. [R. 63-64]. She leaves her home an average of twice a week to go to the store or the doctor. [R. 64]. She is able to drive but her niece drives her because her car has a stick shift, and it's hard for her to shift gears. [R. 65]. She shops once a week for groceries, and it takes her "a couple hours or so" because she "ha[s] to go slow with the dizziness and . . . walking." [*Id.*]. She takes care of her own financial matters. [R. 65-66]. She has no income. [R. 66]. She has housing assistance and her family helps her with utilities. [*Id.*]. She visits with family or friends outside her home only on holidays; she does not participate in any clubs or organizations, nor does she go to church. [*Id.*].

Jones testified pain and swelling prevent her from standing and walking off-and-on for six hours out of an eight-hour day. [R. 66]. She has a handicapped parking placard issued in September 2011 by Dr. Hudson, a Dream Center physician. [R. 66-67]. She can lift and carry 10 pounds. [R. 67]. Her knees prevent her from being able to lift and carry more than that. [*Id.*]. She has problems listening to instructions from supervisors, and criticism from them upsets her. [*Id.*]. She testified she has problems completing tasks she starts because of her mind, and had problems with attention and concentration during the mental status examination Social Security sent her to because her mind and body are "not the same." [R. 68]. She is unable to

5

handle changes in a routine well because of her depression. [*Id.*]. She cannot handle normal stress because she is "not functioning well" and her "mind is not there." [R. 68-69]. Thinking is stressful. [R. 69]. Her doctor recommends that she "[w]alk away and calm down" to relieve the stress. [*Id.*].

The ALJ described the following limitations to the vocational expert ("VE"): Claimant is limited to light work as defined in the regulations (lift or carry, push or pull up to 10 pounds frequently, 20 pounds occasionally); can stand or walk six hours a day, sit six hours daily, cannot operate any foot controls; can have superficial and incidental work-related interaction with co-workers and supervisors, but not in a team environment; no public interaction; limited to simple, routine, repetitive tasks. [R. 71-72]. The VE testified Jones cannot perform any of her past work with these limitations. [R. 72]. He identified the following jobs Jones could perform with the limitations described by the ALJ: hand sorting (753.587-101); hand packaging (753.687-038); office helper (239.567-010); assembly (732.684-062); light mail sorting (209.587-010).[2]

The ALJ posed another hypothetical, asking the VE to assume the individual is limited to sedentary work as defined in the regulations, with no foot controls. In addition to the same mental limitations in the first hypothetical, the individual would be unable to sustain concentration and attention for even two hours at a time and as a result of an inability to handle normal work stress, would be required to take frequent unscheduled breaks in addition to the normal breaks afforded an employee; and would likely be absent three or more times per month on a regular basis. [R. 73]. The VE testified the individual would be unable to perform any work in competitive employment. [*Id.*].

---

[2] The actual job title is "addresser." DICOT 209.587-010. An addresser "[m]ay sort mail." *Id.*

## V. Medical Records

### A. Treating Physician Records

The administrative record includes medical records from Saint Francis Hospital dated May 11, 2001 through February 21, 2008, and pertaining to a hysterectomy, periodic mammograms, and emergency room visits for minor accidental injuries and/or illnesses. [R. 249-306].

The balance of treating records are from the Dream Center. [R. 307-331, 362-366, 370-378]. They show that Jones complained of urinary tract infections ("UTIs") in November 2007 [R. 318], February 24, 2007 [R. 321], September-October 2010 [R. 363-365] and February 2011 [378]. She was treated with antibiotics and/or recommendations to drink more water and cranberry juice. [*Id.*].

Jones first complained of knee pain during a visit to the Dream Center on June 6, 2007. [R. 320]. On examination, her right knee had full range of motion but showed joint line tenderness. [*Id.*]. Dr. Hudson diagnosed probable degenerative joint disease of the right knee and prescribed Naproxen. [*Id.*]. On January 7, 2009, plaintiff again presented at the Dream Center, complaining of joint pain in both knees, and the examining physician ordered x-rays. [R. 313]. X-rays were performed the same day. [R. 327]. The x-rays showed:

> a moderate amount of narrowing about the medial sides of both knee joints as well as some narrowing about the patellofemoral spaces bilaterally. There is noted to be some bony deformity and bony irregularity involving the posterior aspects of both patellas. Small bony spurs are noted involving both knee regions. There is noted to be some bony demineralization involving all of the visualized bony structures on these films.

[*Id.*].

Jones again visited the Dream Center on April 1, 2009, complaining of chest and abdominal pain. [R. 312]. The nurse's note states: "needs written statement that she did need to

quit job due to stress at work causing health problems." [*Id.*]. The same date, Dr. Hudson completed a "return to work" form stating "Pt should not return to work!!" [R. 307]. In the "Comment" section, he stated, "stress related anxiety/Depression." [*Id.*]. Jones continued to make periodic visits to the Dream Center, receiving treatment for high blood pressure, nasal allergies, gastrointestinal issues, vertigo, ringing in ears and urinary tract infections. [R. 309-311, 362-366, 378]. On February 23, 2011, she presented complaining of left knee pain and numbness in her right foot. [R. 378]. The doctor prescribed ibuprofen. [*Id.*]. On March 9, 2011, in a recheck for a bladder infection, she complained that her knees were causing her pain and her arthritis pills did "not work." [R. 377]. In a return visit on June 29, 2011 she complained of right knee pain and reported the knee locked at times. [R. 375]. The doctor examined her knee and found no effusion of the knee. [*Id.*]. On October 5, 2011—Jones' last visit to the Dream Center before the administrative hearing—she again reported right knee pain and told the doctor she thought "it could give anytime," but she had not fallen. [R. 370]. The doctor noted normal range of motion in the right knee. [*Id.*].

Jones first complained of depression during her April 1, 2009, visit to the Dream Center, when she requested and received a note from the doctor stating she should not return to work. [R. 307, 312]. She next complained of depression during a September 15, 2010 visit. [R. 365]. The doctor prescribed Citalopram, an antidepressant. [*Id.*].[3] In a visit on August 9, 2011, she complained that she felt the Citalopram was not working and reported she was "tired a lot," emotional, "can't get up" and depressed. [R. 377]. On September 14, 2011, she again complained of depression. [R. 371].

---

[3] The list of "Current Medications" included the statement, "Depression med (pt cannot remember)." [R. 365]. However, there is no evidence in the record that Jones was prescribed any medication for depression before the September 15, 2010 visit.

8

As the Magistrate Judge noted, Jones did not list an antidepressant in her disability report, although she did list depression as one of the physical or mental conditions limiting her ability to work. [R. 172, 179, 195]. Similarly, she did not list an antidepressant in her list of medications when she attended the consultative psychological examination. [R. 333-340]. In the final list of medications (undated but completed sometime after February 24, 2011), Jones stated she had been taking tramadol for depression in 2010. [R. 241]. However, the record contains no evidence she had been prescribed tramadol.

### B. Dr. Koldkolo's Medical Opinions

Dream Center physician Dennis Koldkolo, M.D. completed four medical forms concerning Jones, all dated November 9, 2011. [R. 379-382]. In the first, "Medical Opinion Re: Clinical Assessment of Pain," he opined that (1) Jones had pain to such an extent as to cause a limitation or restriction having more than a minimal effect on her ability to do basic work activities or activities of daily living on a day-to-day basis; (2) basic physical work activities would increase the level of pain to such a degree as to cause inadequate functioning in such tasks or total abandonment of tasks; (3) the pain experienced by Jones would not reduce her ability to perform basic mental work activities; and (4) side effects from the prescribed medication could be expected to be severe and to limit her effectiveness due to distraction, inattention, and drowsiness. [R. 379]. He opined that Jones' degenerative joint disease in her right knee was consistent with the pain she experiences. [*Id.*].

In the second form, "Medical Opinion Re: Sedentary Work Requirements," Dr. Koldkolo indicated exertional limitations which would preclude Jones from performing less than the full range of sedentary work. [R. 380]. He opined she could not: stand and/or walk for up to two hours in an eight-hour workday; lift or carry 10 pounds, lift five pounds on a repetitive basis;

9

stoop for up to two hours in an eight-hour day; utilize both hands for fine manipulation; maintain her head in a flexed downward position for extended periods in an eight-hour workday; sustain activity at a pace and with the attention to task as would be required in the competitive workplace; medically sustain normal work stress in a routine setting on a day-to-day basis; or be expected to attend any employment on a sustained basis. [*Id.*]. Dr. Koldkolo indicated Jones has a non-exertional impairment which has a neurological, psychological, allergenic, respiratory or environmental restriction associated with it or in which pain, fatigue or intelligence substantially restrict the patient's ability to function. [*Id.*]. However, he did not identify the impairment or impairments. [*Id.*] He also left blank the section that asks: "What are the <u>objective</u> medical findings that support <u>your</u> opinion (above):" [*Id.*].

In the third form, "Medical Opinion Re: Basic Unskilled Work Requirements," he opined that Jones was capable of performing most requirements but that she cannot maintain concentration and attention for extended periods in a routine work setting, cannot handle normal work stress in a routine work setting and cannot be expected to attend any employment on a sustained basis. [R. 381]. He indicated that the limitations he had identified would still be present in the absence of any current drug and/or alcohol use. [*Id.*].

In the fourth form, "Medical Opinion Re: Absences from Work," he opined that as a result of Jones' health problems and related symptoms, she would probably miss work three or more days a month. [R. 382]. He indicated that pain, depression and hypertension would contribute to her absences from work. [*Id.*].

Dr. Koldkolo did not indicate in the forms whether he is a treating physician of Jones, but three of the medical reports documenting Jones' visits to the Dream Center appear to have been signed by him. [R. 310, 370, 375].

10

### C. Consultative Examination Records

Maribeth Spanier, Ph.D. performed a consultative Mental Status/Diagnostic Examination of Jones on July 20, 2010. [R. 333-340]. Dr. Spanier found that Jones "appears to have a longstanding grief reaction that has not been treated" and diagnosed her with moderate major depressive disorder. [R. 339]. Jones reported her problems began after her husband's death in 2004. [R. 335]. She told Dr. Spanier she continued to work until 2008 when she quit due to stress, and depression and problems with her supervisor. [*Id.*]. Jones told the doctor her ability to work was affected by poor energy and motivation, poor sleep, desire to be away from people and trouble getting along with her supervisor and co-workers. [*Id.*]. She reported no current or previous mental health treatment. [R. 337].

Dr. Spanier reported Jones' affect was sad and she was slightly distracted and detached through the interview. [R. 338]. However, her thoughts were logical and organized. [*Id.*]. Based on the formal mental status exam, as well as her behavior in interview, Dr. Spanier concluded Jones' attention and concentration are considered variable and limited. [*Id.*]. She estimated Jones' IQ was in the Low Average or higher range, but with concentration and attention affecting her abilities. [*Id.*]. Dr. Spanier opined that Jones had adequate judgment and could manage her own funds. [R. 340].

Based on Dr. Spanier's report, Janice B. Smith, Ph.D., completed a Mental Residual Functional Capacity Assessment. [R. 341-343]. She found marked limitations in Jones' ability to understand and remember detailed instructions, her ability to carry out detailed instructions and her ability to interact appropriately with the general public. [R. 341-342]. In her Functional Capacity Assessment, she concluded Jones can perform simple tasks with routine supervision;

relate to supervisors and peers on a superficial work basis; and adapt to a work situation. [R. 343]. She found Jones cannot relate to the general public. [*Id.*].

## VI. ALJ's Decision

At Step One, the ALJ determined Jones had not engaged in substantial gainful activity since January 7, 2009, the amended application date. [R. 24]. At Step Two, she determined Jones had severe impairments of degenerative joint disease of the knees and depression. [*Id.*]. At Step Three, the ALJ found Jones did not have an impairment or combination of impairments that meets or medically equals the severity of any listed impairment. [*Id.*].

The ALJ found that Jones has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except she is unable to operate foot controls; she is limited to simple, routine repetitive tasks; she is able to have superficial and incidental work-related interaction with co-workers and supervisors, but would not be effective in a team environment; and she should be in a job that does not require significant public interaction to complete job duties. [R. 26]. At Step Four, the ALJ found that Jones is unable to perform any past relevant work. At Step Five, she found there were jobs in significant numbers in the national economy that Jones could perform, considering her age, education, work experience and RFC, including hand sorter, DOT Code 753.587-010, unskilled work at the light level of exertion; hand packager, DOT Code 753.687-038, unskilled work at the light level of exertion; office helper, DOT Code 239.567-010, unskilled work at the light level of exertion; assembler, DOT Code 732.684-062, unskilled work at the sedentary level of exertion; and clerical mailer, DOT Code 209.587-010, unskilled work at the sedentary level of exertion. [R. 32].

## VII. Analysis

On appeal and in her objection to the Magistrate Judge's Report and Recommendation, Jones argues the ALJ failed to properly consider the medical source opinion evidence. Specifically, she asserts the ALJ should have adopted the opinion of the treating physician, Dr. Koldkolo. [Dkt. #21 at 1]. She contends that if the ALJ had done so, then she would have found Jones is limited to a sedentary exertional level of work, and she would have been awarded benefits. [*Id.*].

"The initial step in evaluating the opinion of a treating source is to determine whether the opinion merits 'controlling weight.'" *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005). The court in *Hackett* explained:

> The analysis is sequential. The ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." S.S.R. 96-2p, 1996 WL 374188, at *2 (quotation omitted). If the answer to this question is "no," then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. *Id.* In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight. *Id.*

*Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). When an ALJ rejects a treating physician's opinion, she must articulate "specific, legitimate reasons for his decision." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). She must also consider a series of specific factors in determining what weight to give any medical opinion, including:

> (1) [T]he length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301; 20 C.F.R. § 404.1527(c)(1)-(6)). "After considering the pertinent factors, the ALJ must give good reasons in [the] notice of determination or decision for the weight he ultimately assigns the opinion," and if she rejects the opinion completely, "[s]he must then give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (citations and quotations omitted). If the medical opinion contains conclusions regarding issues reserved to the Commissioner, the ALJ cannot give that opinion controlling or significant weight, although the ALJ still must evaluate the opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p.

A review of the decision demonstrates the ALJ assumed Dr. Koldkolo was a treating physician. [R. 30]. Addressing factors (1), (2) and (5) from *Watkins*, she stated "it is unclear from the record his specialty, or the length and frequency of his treatment of the claimant." [R. 30]. The ALJ also discussed factors (3) and (4). Referencing Dr. Koldkolo's Medical Opinion Re: Sedentary Work Requirements [R. 380], she stated, "There is no indication in the record that the claimant's degenerative joint disease would affect her ability to hold her head in a flexed downward position or utilize the hands for fine manipulation." [R. 30]. Regarding Jones' right knee, she commented, "Although there are complaints of pain, the objective findings have shown no effusion and normal range of motion of the knee." [*Id.* (referencing R. 370, 375)].[4] The ALJ acknowledged that x-rays in the record indicated the presence of degenerative joint disease but stated, "the above findings on physical examination do not fully support the allegations of pain, and Dr. Koldkolo's indication that such pain would cause inadequate functioning in or abandonment of basic physical work activities." [R. 30]. She noted "[a]dditional limitations are also not well supported by or fully consistent with the Dream Center treatment notes." [*Id.*]. The ALJ noted "Dr. Kolkolo's statements regarding the claimant's inability to maintain attention and

---
[4] As previously noted, the report from the October 5, 2011 visit, which appears to have been signed by Dr. Koldkolo, indicated Jones' right knee had normal range of motion. [R. 370]. Similarly, the report dated June 29, 2011—also signed by Dr. Koldkolo—indicates no effusion of the knee. [R. 375].

14

concentration for extended periods" and her "inability to handle normal work stress," but stated, "After careful consideration of the record, I find the claimant is limited to simple, routine, repetitive tasks; further limitation is not supported in the record. There is an absence of mental health treatment in the record." [*Id.*]. She concluded, "I accord Dr. Koldkolo's opinions little weight." [*Id.*].

The ALJ articulated "specific, legitimate reasons" for rejecting Dr. Koldkolo's opinions. *See Hamlin*, 365 F.3d at 1215. Her reasons are supported by the record. Therefore, the court finds no error in her decision to accord the doctor's decision little weight.

## VIII. Conclusion

For the reasons set forth above, the court overrules Jones' Objections to the Magistrate Judge's Report and Recommendation. [Dkt. #21]. The Magistrate Judge's Report and Recommendation [Dkt. #20] is accepted, and the decision of the Commissioner is affirmed.

ENTERED this 4th day of August, 2014.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT